**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**FILED**

AUG 1 1 2009

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Criminal Action No. 07-225 (RBW) |
| | ) |
| AITOFELE T.F. SUNIA | ) |
| and TINI LAM YUEN, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OPINION**

Aitofele T.F. Sunia and Tini Lam Yuen, the defendants in this criminal case, have filed a motion to dismiss in whole or in part Counts One through Six of the indictment against them pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B). Joint Motion of Aitofele T.F. Sunia and Tini Lam Yuen to Dismiss in Whole or in Part Counts One through Six at 1. On September 8, 2008, the Court heard oral argument on the defendants' motion and denied the motion insofar as it sought to dismiss Counts Five and Six of the indictment in their entirety and Count One of the indictment in part. Currently before the Court is the balance of the motion to dismiss and a motion for partial reconsideration of the Court's earlier oral rulings filed by the defendants. After carefully considering the indictment, the defendants' motions, all memoranda of law and exhibits relating to those motions,[1] and the parties' oral representations at the September 8

---

[1] In addition to the indictment and the defendants' motions, the Court considered the following documents in reaching its decision: (1) the Memorandum of Law in Support of Joint Motion of Aitofele T.F. Sunia and Tini Lam Yuen to Dismiss in Whole or in Part Counts One through Six (the "Defs.' Dismissal Mem."), (2) the Government's Opposition to Defendants' Motion to Dismiss in Whole or in Part Counts One through Six of the Indictment (the "Gov't's Dismissal Opp'n"), (3) the Reply Memorandum in Support of Joint Motion of Aitofele T.F. Sunia and Tini Lam Yuen to Dismiss in Whole or in Part Counts One through Six (the "Defs.' Dismissal Reply"), (4) the Government's Submission of Supplemental Authority in Opposition to Defendants' Motion to Dismiss in Whole or (continued . . . )

hearing and the subsequent hearing regarding these motions held on August 4, 2009, the Court

concludes that it must grant the balance of the defendants' motion, grant the defendants' motion

for reconsideration, dismiss in part Counts Two through Four of the indictment, and dismiss

Counts Five and Six of the indictment in their entirety for the reasons that follow.

## I. Background

The following facts are alleged in the indictment. Sunia, who "currently serves as

Lieutenant Governor of American Samoa," Indictment ¶ 8, and previously served as Treasurer of

the American Samoa government from July 9, 2001, to April 11, 2003, Acting Treasurer from

April 11, 2003, until June 6, 2003, id. ¶ 10, and "Counsel to the Fono [the territory's legislative

body] from February 16, 1999[,] to July 9, 2001," id. ¶ 11, along with Lam Yuen, who has

served as a member of the Fono since January 3, 2001, id. ¶ 15, allegedly "conspire[d] . . . with

the [American Samoa] Chief Procurement Officer, [] Director of Education, and others . . . to

commit offenses against the United States," id. ¶ 26, including fraudulent receipt of federal

"payments totaling $775,000 made to companies under their control, in exchange for supplying

furniture to the [American Samoa Department of Education] valued at more than $5,000," id.

¶ 26(a), and bribery of "the Director of Education and the Chief Procurement Officer," id.

¶ 26(b). The defendants allegedly engaged in this conspiracy "to personally enrich themselves,

their relatives, and their business associates" by "secur[ing] for companies under their control

lucrative payments totaling hundreds of thousands of dollars in exchange for manufacturing and

---

in Part Counts One through Six of the Indictment, (5) Aitofele T.F. Sunia['s] and Tini Lam Yuen's Response to Government's Submission of Supplemental Authority, (6) Aitofele T.F. Sunia['s] and Tini Lam Yuen's Joint Motion for Reconsideration of Motion to Dismiss Counts Five and Six of the Indictment (the "Defs.' Reconsideration Mot."), (7) the Government's Opposition to Defendants' Motion for Reconsideration of Motion to Dismiss Counts Fix and Six (the "Gov't's Reconsideration Opp'n"), (8) Aitofele T.F. Sunia['s] and Tini Lam Yuen's Reply to Government's Opposition to Joint Motion for Reconsideration of Motion to Dismiss Counts Fix and Six of the Indictment (the "Defs.' Reconsideration Reply"), and (9) the Submission of American Samoa Law in Support of Joint Motion of Aitofele T.F. Sunia and Tini Lam Yuen to Dismiss Count Two As to the Periods When They Were Legislative Branch Officials.

supplying classroom and library furniture for the [American Samoa Department of Education]." Id. ¶ 27.

Specifically, the defendants allegedly "obtain[ed] payments in connection with the [American Samoa Department of Education's] furniture projects" by "us[ing] false and fraudulent means, including improperly structuring invoices and other procurement documents . . . to circumvent the [American Samoa] procurement laws and avoid the competitive bidding process." Id. ¶ 28(b). This alleged fraudulent process allowed the defendants to "effectively eliminate[] price competition for the furniture" and "charge[] artificially high prices for the furniture," thereby "wast[ing] [American Samoa] and federal grant funds that could have been used for other [American Samoa] Department of Education needs." Id. ¶ 28(c). Further, the defendants allegedly gave the American Samoa Chief Procurement Officer "a share of the furniture projects for [the Chief Procurement Officer's] company, [Samoa Wood Products, Inc.], in consideration for his agreement not to enforce procurement regulations and not to open the jobs up for competitive bidding," id. ¶ 28(d), and allegedly gave the American Samoa Director of Education "cash payments and free contracting work on his house[] to reward him for dividing up and awarding furniture payments to companies under [the defendants'] control in violation of the procurement regulations," id. ¶ 28(e).

While acting as Treasurer for the American Samoa government, Sunia allegedly "processed payment of the furniture invoices using both local and federal funds," in some instances "plac[ing] his own signature on the checks." Id. ¶ 28(f). The defendants, "the Chief Procurement Officer, their employees, or their family members [allegedly] picked up the checks . . . in person at either the []Treasury or [Department of Education] offices." Id. ¶ 28(g). In turn, the "the Director of Education and other [Department of Education] officials [allegedly]

awarded additional furniture jobs" to companies owned by the defendants using "the same fraudulent and misleading manner to circumvent the procurement regulations." Id. ¶ 28(h). Sunia allegedly concealed his involvement by "incorporating [his] company under the names of his daughter and two business associates." Id. ¶ 28(i).

"In or about August [of] 2003," the Office of Inspector General of the United States Department of Education "commenced an investigation into fraud, waste[,] and abuse involving federal grant funds issued to the [American Samoan] government." Id. ¶ 55. This investigation was conducted "jointly with agents from the Office of Inspector General of the United States Departments of the Interior and Homeland Security and the Federal Bureau of Investigation." Id. As part of this investigation, Sunia "submitted to a voluntary interview with federal law enforcement agents from the [United States] Department of Homeland Security's Office of Inspector General and the Federal Bureau of Investigation," id. ¶ 57, at which time he allegedly "[made] materially false and misleading statements to federal agents" to the effect that "his daughter ran [Sunia's company], that [his company] was doing work for the Library Services Office of the [American Samoa Department of Education] on a 'need basis' only, and that [Sunia] did not intentionally keep his name off [] the articles of incorporation of [his company]," id. ¶ 58. Similarly, Lam Yuen "submitted to a voluntary interview with federal law enforcement agents from the [United States] Department of the Interior Office of Inspector General and the Federal Bureau of Investigation," id. ¶ 62, where he allegedly "[made] materially false and misleading statements" to the effect that "he never gave any money to [the American Samoa Director of Education] and that he never gave anything of value to [the American Samoa Director of Education] for free," id. ¶ 63.

The grand jury returned its indictment against the defendants on September 6, 2007.  The indictment charges the defendant with six offenses.  In Count One, the indictment alleges that the defendants conspired with the Chief Procurement Officer and the Director of Education of American Samoa as well as "others both known and unknown to the grand jury" to commit fraud concerning programs receiving federal funds and bribery concerning programs receiving federal funds.  Id. ¶ 26.  Counts Two and Three charge both defendants with these offenses directly pursuant to 18 U.S.C. § 666(a)(1)(A) and 18 U.S.C. § 666(a)(2).  Id. ¶¶ 48–51.  Count Four charges Lam Yuen with a separate violation of § 666(a)(2).  Id. ¶¶ 52–53.  Finally, Counts Five and Six charge Sunia and Lam Yuen, respectively, with obstruction of an agency proceeding in violation of 18 U.S.C. § 1505.  Id. ¶¶ 54–63.

The defendants filed their motion to dismiss various counts of the indictment in whole or in part on June 27, 2008.  In support of their motion, the defendants argue that Count One of the indictment requires dismissal "to the extent it is based on acts that purportedly occurred before January 4, 2001," because "[b]y its terms, the alleged conspiracy [could not] have existed until at least two of the [e]xecutive [b]ranch officials" alleged to be a member of this conspiracy held positions in the executive branch, which did not occur until that date.  Defs.' Dismissal Mem. at 1; see also id. at 9–10 (making this argument).  They also assert that Count Two requires dismissal in its entirety with respect to Lam Yuen and in part with respect to Sunia because Lam Yuen was never an "agent" within the meaning of § 666(a)(1)(A) and Sunia did not become an "agent" within the meaning of the statute until he was appointed to the executive branch of the America Samoan government.  Id. at 1, 10–13.  Further, the defendants contend that Counts Two and Three of the indictment are time-barred to the extent they are based on acts that allegedly occurred more than five years before the return of the indictment, id. at 1–2, 13–20, and that

Count Four must be dismissed for the same reason insofar as it is based on alleged bribes that occurred more than five years before the return of the indictment, id. at 2, 20–21. Finally, they argue that Counts Five and Six of the indictment are defective because the government fails to allege two necessary facts: (1) that the defendants' alleged obstruction had the "natural and probable effect" of obstructing the agency investigation leading to the defendants' criminal indictment, id. at 2, 21–24; and (2) that the defendants knew or believed that an agency investigation was pending when they made their allegedly obstructive statements, id. at 2, 25–26.

The government challenges each of these arguments. It asserts that there is enough ambiguity in the allegations set forth in the indictment to cover actions taken by the conspirators prior to January 4, 2001, and that a conspiracy can begin before all of its elements are in place. Gov't's Dismissal Opp'n at 4–6. It contests the defendants' interpretation of the term "agent" in § 666(a)(1)(A), arguing that both defendants were "agents" of the America Samoan government, if not the executive branch, when they were employed by the legislative branch of the government. Id. at 6–11. And it disputes the application of the statute of limitations with respect to Counts Two through Four, arguing that, with respect to all three counts, there was a continuing course of conduct that prevented the statute of limitations from accruing, id. at 12–17, 18–21, and that Count Two concerns a "continuous offense" that did not end until the final criminal act was committed, id. at 17–18. Finally, the government argues that 18 U.S.C. § 1505 does not require the government to allege a nexus between the defendants' allegedly obstructive statements and the proceeding allegedly obstructed, id. at 24–25, and that the lies allegedly told by the defendants obstructed justice, id. at 25–26.

The parties argued these points in a hearing held on September 8, 2008. At that hearing, the Court ruled from the bench that the defendants' arguments with respect to Counts One, Five,

and Six were without merit, and therefore denied the defendants' motion with respect to those counts. The Court declined to rule with respect to the remainder of the defendants' arguments. The government has since filed a notice of supplemental authority in opposition to the defendants' motion, to which the defendants have responded.

The defendants filed their joint motion for partial reconsideration of the Court's September 8, 2008 oral ruling on July 10, 2009. In that motion, they revisit their argument that Counts Five and Six of the indictment run afoul of the Grand Jury Clause of the Fifth Amendment because the government never alleges that the defendants knew of the agency proceeding they allegedly obstructed, an element of the offenses charged in those counts. Defs.' Reconsideration Mot. at 1–2, 6–12. The government counters that there is no need for the Court to reconsider this previously rejected argument, Gov't's Reconsideration Opp'n at 2–3, 6–7, and that the Court's ruling was correct in any event, id. at 3–6. Not surprisingly, the defendants find these arguments wanting. See Defs.' Reconsideration Reply at 1–5 (arguing that the Court clearly erred in denying the defendants' motion to dismiss Counts Five and Six and deriding the "inordinate attention" devoted by the government "to the standard on a motion for reconsideration").

At a hearing held on August 4, 2009, the Court heard oral argument from the parties regarding the defendants' motion for reconsideration. The Court also posed additional questions to the parties regarding the applicability of § 666(a)(1)(A) to the defendants and heard additional argument from the parties regarding that issue. At the conclusion of that hearing, the Court indicated that it would endeavor to issue a memorandum opinion regarding the outstanding portions of the defendants' motion to dismiss and their motion for reconsideration within a week's time. This memorandum opinion fulfills the Court's promise.

## II. Standard of Review

As the Court previously noted, the defendants seek dismissal of portions of the indictment against them pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B) as well as partial reconsideration of the Court's oral rulings issued on September 8, 2008. As the defendants' motions entail distinct standards of review, the Court writes separately with respect to each request.

A.    Motion to Dismiss under Federal Rule of Criminal Procedure 12(b)(3)(B)

"[A]t any time while the case is pending, the court may hear a claim that the indictment . . . fails to invoke the court's jurisdiction or to state an offense." Fed. R. Crim. P. 12(b)(3)(B). "In ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the face of the indictment and, more specifically, the language used to charge the crimes." United States v. Sharpe, 438 F.3d 1257, 1263 (11th Cir. 2006) (emphasis in original). "Adherence to the language of the indictment is essential because the Fifth Amendment requires that criminal prosecutions be limited to the unique allegations of the indictments returned by the grand jury." United States v. Hitt, 249 F.3d 1010, 1016 (D.C. Cir. 2001). The district court must "presume the allegations of [the] indictment to be true," United States v. Fiander, 547 F.3d 1036, 1041 n.3 (9th Cir. 2008) (internal citation and quotation marks omitted), and "may not dismiss an indictment on a determination of facts that should have been developed at trial," Sharpe, 438 F.3d at 1263 (internal citation and quotation marks omitted).

B.    Motion for Reconsideration of Interlocutory Decisions

"Although the Federal Rules do not specifically provide for motions for reconsideration in criminal cases, the Supreme Court has recognized, in dicta, the utility of such motions." United States v. Ferguson, 574 F. Supp. 2d 111, 113 (D.D.C. 2008); see also United States v.

Dieter, 429 U.S. 6, 8 (1976) (per curiam) (noting "the wisdom of giving district courts the opportunity promptly to correct their own alleged errors"). Thus, this Court assumes, as it has in the past, that it can consider such a motion in a criminal case. See United States v. Booker, 613 F. Supp. 2d 32, 34 (D.D.C. 2009) (citing Dieter and United States v. Healy, 376 U.S. 75, 78 (1964), as support for the notion that the Court can consider motions for reconsideration in criminal cases); Ferguson, 574 F. Supp. 2d at 113 (proceeding "on the assumption that it may consider" a motion for reconsideration in ruling on government's motion for reconsideration of order dismissing indictment); United States v. Libby, 429 F. Supp. 2d 46, 46–47 (D.D.C. 2006) (Walton, J.) (considering the merits of the government's motion for reconsideration of evidentiary ruling).

  In Libby, this member of the Court adopted without explanation the standard of review for motions for reconsideration filed under Rule 59(e) of the Federal Rules of Civil Procedure as the appropriate standard for motions for reconsideration in criminal cases. Libby, 429 F. Supp. 2d at 46–47. Other members of the Court have, in turn, relied upon Libby as authority for employing this standard of review in considering their own motions for reconsideration. See Ferguson, 574 F. Supp. 2d at 113 (adopting the Libby standard without comment); see also Booker, 613 F. Supp. 2d at 34 (citing Libby and Ferguson as authority for the use of this standard). However, in civil cases "[t]he standard of review for interlocutory decisions differs from the standards applied to final judgments under Federal Rules of Civil Procedure 59(e) and 60(b)." Williams v. Savage, 569 F. Supp. 2d 99, 108 (D.D.C. 2008). "In particular, reconsideration of an interlocutory decision is available under the standard, 'as justice requires.'" Judicial Watch v. Dep't of Army, 466 F. Supp. 2d 112, 123 (D.D.C. 2006). As the Court's decision to deny the defendant's motion to dismiss with respect to Counts Five and Six is

interlocutory in nature, see United States v. Hollywood Motor Car Co., Inc., 458 U.S. 263, 264–65 (1982) (holding that order denying motion to dismiss the indictment was not a "final order" within the meaning of 28 U.S.C. § 1291), and as the Court's apparent intention in Libby was to simply transplant into the criminal context the standard of review for an analogous motion for reconsideration filed in a civil case, the Court will evaluate the merits of the defendants' motion for reconsideration under the "as justice requires" standard rather than the standard enunciated in Libby.

"'As justice requires' indicates concrete considerations by the [C]ourt . . . ." AFL-CIO v. Bullock, 605 F. Supp. 2d 251, 257 (D.D.C. 2009). These considerations "include whether the Court 'patently' misunderstood the parties, made a decision beyond the adversarial issues presented, made an error in failing to consider controlling decisions or data, or whether a controlling or significant change in the law has occurred." Isse v. Am. Univ., 544 F. Supp. 2d 25, 29 (D.D.C. 2008). Further, "for justice to require reconsideration, logically, it must be the case that[] some sort of 'injustice' will result if reconsideration is refused. That is, the movant must demonstrate that some harm . . . would flow from a denial of reconsideration." Cobell v. Norton, 355 F. Supp. 2d 531, 540 (D.D.C. 2005).

"Even if the appropriate legal standard does not indicate that reconsideration is warranted, the Court may nevertheless elect to grant a motion for reconsideration if there are other good reasons for doing so." Isse, 544 F. Supp. 2d at 29 (internal citation and quotation marks omitted). However, "while the law of the case doctrine does not necessarily apply to interlocutory orders, district courts generally consider the doctrine's underlying rationale when deciding whether to reconsider an earlier decision." Malewicz v. City of Amsterdam, 517 F. Supp. 2d 322, 328 (D.D.C. 2007). The Court therefore considers the defendants' motion for

reconsideration "subject to the caveat that, where litigants have once battled for the Court's decision, they should neither be required, nor without good reason permitted, to battle for it again." Lemmons v. Georgetown Univ. Hosp., 241 F.R.D. 15, 22 (D.D.C. 2007) (Walton, J.) (quoting Judicial Watch, 466 F. Supp. 2d at 123 (internal citation and quotation marks omitted)).

### III. Legal Argument

In light of the Court's oral rulings at the hearing on the merits of the defendants' motion held on September 8, 2008, the only issues arising from the defendants' motion to dismiss that have not yet been resolved are (1) whether Lam Yuen and, for the period of time that he was an agent of the legislative rather than the executive branch, Sunia were "agents" as required to state an offense under 18 U.S.C. § 666(a)(1)(A), and (2) whether Counts Two through Four are time-barred to the extent that they cover conduct that allegedly occurred more than five years before the indictment was returned due to the limitations period set forth in 18 U.S.C. § 3282. To these the Court must add the sole issue raised in the defendants' motion for reconsideration: namely, whether the Court erred in concluding that Counts Five and Six should not be dismissed notwithstanding the government's conceded failure to explicitly allege that the defendants knew about the agency proceedings they allegedly obstructed. The Court considers each of these issues in turn.

A.    Applicability of 18 U.S.C. § 666(a)(1)(A)

Count Two of the indictment charges both defendants with violations of 18 U.S.C. § 666(a)(1)(A). Indictment ¶¶ 48–49. Section 666 states in pertinent part:

> (a) Whoever, if the circumstance described in subsection (b) of this section exists—
>
> > (1)    being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—

> (A)   embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that—
>
> > (i)   is valued at $5,000 or more, and
> >
> > (ii)   is owned by, or is under the care, custody, or control of such organization, government, or agency; []
>
> . . . .
>
> shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 666(a)(1)(A) (2006) (emphasis added). "[T]he term 'agent,'" as used in the statute, "means a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative." Id. § 666(d)(1).

The parties disagree as to whether the indictment properly alleges that the defendants were agents of the "organization, government, or agency" in whose "care, custody, or control" the property at issue here resided. Id. § 666(a)(1)(A)(ii). According to the defendants, they "[could not] have violated § 666(a)(1)(A) unless each [of them] was an 'agent' of" the executive branch of the American Samoa government because it was that branch of the government that "received the requisite federal funds" giving rise to the indictment. Defs.' Dismissal Mem. at 10. "As [c]ounsel to the [l]egislative [b]ranch[] [until] July 9, 2001," Sunia asserts that he could not have been an agent of the executive branch prior to that time, while Lam Yuen, who served "[a]s a [m]ember of the Senate, . . . [could] never [have been] such an agent." Id. (emphasis in original).

The government counters that the American Samoa government is "a tight-knit group of political and social allies who work closely within the power structure of the territory," and that

the defendants "were part of this power structure."  Gov't's Dismissal Opp'n at 7–8.  It argues

that the defendants' interpretation of § 666(a)(1)(A) "ignores [the fact] that the statute clearly

allows for application" to agents of a "government," in this case the American Samoa

government.  Id. at 8.  Alleging that "[the] defendants were agents of the [American Samoa

government] and [that] they defrauded the [American Samoa government]" is, according to the

government, "all that is required."  Id. at 9.  Alternatively, the government asserts that the

defendants can still be charged with aiding and abetting a violation of § 666 under Count II of

the indictment.  Id. at 10–11.

 "The first step [in a statutory construction analysis] is to determine whether the language

at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."

Barnhart v. Sigmon Coal Co., Inc., 534 U.S. 438, 450 (2002) (internal citation and quotation

marks omitted).  "When [a] statute's language is plain, the sole function of the courts—at least

where the disposition required by the text is not absurd—is to enforce it according to its terms."

Dodd v. United States, 545 U.S. 353, 359 (2005) (internal citation and quotation marks omitted).

"In ascertaining the plain meaning of the statute, the [C]ourt must look to the particular statutory

language at issue, as well as the language and design of the statute as a whole."  K Mart Corp. v.

Cartier, Inc., 486 U.S. 281, 291 (1988); see also Bailey v. United States, 516 U.S. 137, 145

(1995) ("We consider not only the bare meaning of the word[,] but also its placement and

purpose in the statutory scheme.").

 "Unless otherwise defined, statutory terms are generally interpreted in accordance with

their ordinary meaning," BP Am. Prod. Co. v. Burton, 549 U.S. 84, 91 (2006); however,

"[s]tatutory definitions control the meaning of statutory words," Burgess v. United States, ___

U.S. ___, ___, 128 S. Ct. 1572, 1577 (2008) (internal citation and quotation marks omitted).

Further, "[c]anons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings." Reiter v. Sonotone Corp., 442 U.S. 330, 339 (1979). Finally, the Court presumes that "each term in a criminal statute carries meaning," United States v. Wells, 519 U.S. 482, 493 n.14 (1997); see also Cooper Indus., Inc. v. Aviall Servs., Inc., 543 U.S. 157, 167 (2004) (referencing the "settled rule" that courts "must, if possible, construe a statute to give every word some operative effect"). Further, the Court's "resistance" to treating statutory language as surplusage "is heightened when the words describe an element of a criminal offense." Ratzlaf v. United States, 510 U.S. 135, 140–41 (1994).

The government's proffered reading of § 666(a)(1)(A) does not conform to these canons of statutory construction. Section 666(a) applies only to agents of "organization[s], . . . government[s], or any agency thereof," 18 U.S.C. § 666(a)(1) (emphasis added), suggesting that the terms "organization," "government," and "agency" must be given "separate meanings," Reiter, 442 U.S. at 339. And the statute defines the term "government agency" to mean "a subdivision of the executive, legislative, judicial, or other branch of government." 18 U.S.C. § 666(d)(2). Thus, applying the canon against surplusage, the term "government" cannot be read as encompassing the "subdivision[s]" of those entities; otherwise, the term "agency" would be subsumed within that term and have no "operative effect," Cooper Indus., 543 U.S. at 167. Instead, the term "government" must be interpreted to refer to such an entity only insofar as that entity is holding federal funds at the "executive, legislative, [or] judicial" level, 18 U.S.C. § 666(d)(2), and not insofar as the funds are being held by a subdivision of those entities.

Because the term "government" for purposes of § 666(a)(1)(A) cannot be read to encompass its own "agenc[ies]," and because § 666(a)(1)(A) criminalizes only the conversion of

funds that are "owned by" or are "under the care, custody, or control of" the same "organization, government, or agency" for which the putative wrongdoer is an "agent," the only plausible interpretation of § 666(a)(1)(A) that gives effect to every provision in the statute is one that restricts criminal liability for the conversion of funds from an agency receiving federal funds to agents of that particular agency. Any other interpretation of the statute would make the inclusion of language in the statute regarding agencies subsidiary to and therefore redundant of the language in the statute regarding organizations and governments. Thus, the Court is compelled by the canons of construction that guide its understanding of the statute's plain language to conclude that the defendants' interpretation of § 666(a)(1)(A) is the correct one and that the defendants must have been agents of the American Samoa agency that received the purportedly converted federal funds to be subject to liability under that statute.

The government asserts that this construction of the statute contradicts the Supreme Court's decisions in Salinas v. United States, 522 U.S. 52 (1997), and Sabri v. United States, 541 U.S. 600 (2004), Gov't's Dismissal Opp'n at 7, but those decisions do not implicate § 666(a)(1)(A). In Salinas, the Supreme Court held that a bribe need not affect federal funds to violate § 666 based upon the statute's "expansive, unqualified language." Salinas, 522 U.S. at 56. The "bribery scheme" in Salinas involved the payment of bribes to the Sheriff of Hidalgo County, Texas, and one of his deputies in exchange for preferential treatment of a federal prisoner housed in a Hidalgo County jail pursuant to an agreement between the United States Marshals Service and Hidalgo County. Id. at 54–55. The parties did not address, and the Court did not consider, whether there was a sufficient nexus between the defendants' conduct and the agency receiving federal funds to satisfy the requirements of the statute. Id. at 54–61.

Similarly, the question before the Supreme Court in <u>Sabri</u> was "whether . . . § 666(a)(2) . . . is a valid exercise of congressional authority under Article I of the Constitution" in light of the Court's conclusion in <u>Salinas</u> that a bribe need not directly affect federal funds to run afoul of § 666. <u>Sabri</u>, 541 U.S. at 602. The Supreme Court confined its analysis in <u>Sabri</u> to the constitutionality of § 666(a)(2). <u>Id.</u> at 604–10. It never so much as mentioned § 666(a)(1)(A), let alone purported to define its meaning and scope.

If anything, <u>Salinas</u> and <u>Sabri</u> suggest that this Court's interpretation of § 666(a)(1)(A) is consistent with the purposes underlying the statute. As the Supreme Court explained in <u>Salinas</u>, Congress intended for § 666 to apply where there is "a threat to the integrity and proper operation of [a] federal program." <u>Salinas</u>, 522 U.S. at 61; <u>see also</u> <u>Fischer v. United States</u>, 529 U.S. 667, 678 (2000) (noting Congress' "unambiguous intent" in passing § 666 "to ensure the integrity of organizations participating in federal assistance programs"). However, the "integrity" of a federal program can only be "threat[ened]" from within; i.e., by an agent of the program receiving federal funds. Interpreting § 666(a)(1)(A) in the manner advocated by the government would sweep under the statute's rubric a broad range of conduct that in no way implicates "the reliability of those who use public money," <u>Sabri</u>, 541 U.S. at 608, including the alleged conduct of Lam Yuen and, for at least some period of time, Sunia.

It is therefore not surprising that in the sole case actually addressing the scope of the agency requirement of § 666, <u>United States v. Phillips</u>, 219 F.3d 404 (5th Cir. 2000), the court required that there be "some nexus between the criminal conduct [alleged] and the agency receiving federal assistance" for § 666 to apply, <u>id.</u> at 413–14 (emphasis removed). In that case, Chaney Phillips, a tax assessor for St. Helena Parish, Louisiana, engaged in "several different schemes" involving Emerson C. Newman, "a friend and political supporter" who eventually

became Phillips's co-defendant. Id. at 407. One of these schemes involved placing Newman on

the tax assessor's payroll for a ten-month period in 1995, during which time Newman received

paychecks "amounting to $8,000, or $4,758 after taxes." Id. at 408. Newman, in turn, "credited

this entire amount to Phillips's account at Newman's hardware store." Id.

Ultimately, the jury found that Phillips, inter alia, "wrongly converted funds of the

assessor's office" by "placing Newman on the payroll in 1995, and . . . corruptly accepted

something of value from someone who expected to be rewarded in a transaction with the

assessor's office" by "accept[ing] kickbacks from Newman." Id. at 410. Phillips was thus

convicted of one count of theft or bribery concerning programs receiving federal funds pursuant

to § 666. Id.[2] Phillips appealed his conviction to the United States Court of Appeals for the Fifth

Circuit, arguing that he was not an agent of the St. Helena Parish for purposes of § 666. Id. at

410–11.

The Fifth Circuit found Phillips's argument persuasive. While recognizing that the funds

converted by Phillips "need not [have been] federal" or even "have [had] a direct effect on

federal funds," the court rejected the government's suggestion "that the statute [could] reach any

government employee who misappropriate[d] purely local funds[] without regard to how

organizationally removed the employee [was] from the particular agency that administer[ed] the

federal program." Id. at 411. Instead, the Fifth Circuit inquired as to "whether Phillips, as [a]

tax assessor, was authorized to act on behalf of the parish with respect to its funds." Id.

Ultimately, the court concluded that he was not because (1) "although Phillips was the tax

assessor for property in the parish, the parish ha[d] no power, authority, or control over the

assessor's duties or job," (2) "the assessor's salary [was] not set by the parish, the salary [was]

---

[2] "The federal funds in question were food stamps provided to parish residents." Phillips, 219 F.3d at 410.

not paid for by the parish, and the assessor receive[d] no employee benefits from the parish," id.
at 412, and (3) "[t]here [was] nothing in the record to indicate that Phillips had any ability to
control or administer employees or programs or funds of the parish" or "[the] legal authority to
bind the parish," id. at 413.  The Fifth Circuit therefore reversed Phillips's conviction under
§ 666, observing that his "actions did not [threaten] and could not have threatened the integrity
of federal funds or programs."  Id.

Many of the factors that led the Fifth Circuit to conclude that Phillips was not an agent of
the St. Helena Parish suggest that the defendants should not be viewed as agents of the American
Samoa Departments of Treasury or Education for the duration of their employment by the
legislative branch.  For example, the government does not and, by all accounts, cannot allege that
the American Samoa Departments of Treasury or Education had any "power, authority, or
control over the [defendants'] duties" as employees of the Fono, or that the defendants' salary or
benefits were determined by those agencies.  Id. at 412.  Nor is there any indication in the
indictment or under American Samoa law that Sunia, as Counsel to the Fono from February of
1999 to July of 2001, "had any ability to control or administer employees or programs or funds
of the [Departments of Treasury or Education]" or "[the] legal authority to bind [those
departments]."  Id. at 413.

Other factors are slightly more ambiguous.  While not specified in the indictment, the
government represents that the Department of Treasury issues checks to members and employees
of the Fono, a different arrangement than was the case in Phillips.  Id. at 413.  Moreover, as a
member of the Fono, Lam Yuen had the "ability to control or administer employees or programs
or funds," id., of the Departments of Treasury and Education through his role as a legislator.
Am. Samoa Const. art. II § 1(c) (vesting the American Samoa legislature with "authority to pass

legislation with respect to subject of local application," including "[m]oney bills"); Am. Samoa

Ann. Code § 10.0503 (providing that the American Samoa legislature, inter alia, must "consider

the program and financial plan recommended by the Governor, including . . . [the] recommended

budget" and "adopt legislation to authorize the implementation of a comprehensive program and

financial plan"); id. § 10.0507 (providing that "[t]he [l]egislature shall consider the Governor's

proposed . . . financial plan[,] evaluate alternatives [thereto,] and determine the . . . financial plan

to support the services to be provided the people of the territory").

 Upon closer examination, however, these factors are not as important as they might first

appear. While the Department of Treasury may have written the checks that covered the

defendants' salaries as governmental employees, it would have done so only in its capacity as an

agent of the legislative branch. And the funds allegedly converted from the Department of

Treasury by the defendants were likewise held on behalf of the Department of Education, which

has no role in issuing the defendants' paychecks. By analogy, the Department of Treasury is

more akin to a bank at which one customer (allegedly) robs another than it is to an employer

whose integrity is corrupted by the malfeasance of one of its employees, the paradigmatic § 666

offense.

 As for Lam Yuen's role as a legislator, the Court agrees that this factor would weigh in

favor of finding liability under § 666 had the government alleged that the conversion of the funds

in question were caused by the exercise of his legislative authority in some way. The statute

defines the term "agent" broadly to mean "a person authorized to act on behalf of another person

or a government," including "representative[s]" of that entity, 18 U.S.C. § 666(d)(1), and it is at

least conceivable that legislators would be acting as representatives of the government as a whole

to the extent that they used their official authority to affect the allocation of governmental funds

to specific agencies or legislated with respect to the agencies themselves. After all, the corrupt

practices of a legislator can endanger the "integrity and proper operation" of the government as a

whole as much as the corrupt practices of an employee can affect the integrity of a specific

government agency. Salinas, 522 U.S. at 61.

An example of a case in which such circumstances were present (and upon which the

government relies, see Gov't's Dismissal Opp'n at 8 (citing various authorities in support of the

government's proffered reading of § 666(a)(1)(A)))[3] is United States v. Lipscomb, 299 F.3d 303

(5th Cir. 2002). In that case, "Albert Lipscomb, a former member of the Dallas City Council,

appeal[ed] his convictions for conspiracy and program bribery in violation of . . . § 666," id. at

305, on the grounds that, inter alia, the statute could not be read to encompass the conduct for

which he was convicted, id. at 308–09. As described by the Fifth Circuit, Lipscomb

"energetically used many of the tools at the disposal of a Council member—his vote, his

oversight authority, his agenda-setting power, and his other parliamentary privileges—to support

policies favorable" to a taxi cab company that supplied him with monthly payments "even

though those policies conflicted with his previous positions." Id. at 307. While recognizing the

nexus requirement imposed in Phillips and an earlier case, United States v. Moeller, 987 F.2d

1134 (5th Cir. 1993), the Fifth Circuit found that "whatever nexus § 666 requires—if any—[was]

present" because "[i]n Dallas, federal money supports the City's transportation and human

---

[3] The two other cases cited by the government in support of its interpretation of § 666(a)(1)(A), United States v. Edgar, 304 F.3d 1320 (11th Cir. 2002), and United States v. Delano, 55 F.3d 720 (2d Cir. 1995), are less apropos. In Edgar, the defendants were hospital executives who used their positions to convert hospital funds (some of which were obtained from the government's Medicare, Part A program) for their own benefit. Edgar, 304 F.3d at 1322. Similarly, the defendant in Delano was the former commissioner of the same department of the city government (the Parks Department) from which he converted property, i.e., his employees' labor. Delano, 55 F.3d at 722–23. There was simply no question in these cases that the defendants were agents of the same government agencies that were victims of the defendants' corrupt acts.

services departments—the very agencies of city government that Lipscomb sought corruptly to influence." Id. at 315.

The Court thus acknowledges that a legislator who misuses his legislative authority to facilitate corrupt practices affecting agency programs that receive federal funds may well fall within the ambit of § 666. Under those circumstances, the legislator would be engaging in corrupt acts at the governmental level, not with respect to funds that have been allocated to a specific agency. Applying § 666 to such conduct would be consistent with "the broad 'corruption focus'" that courts have taken with respect to the statute. Lipscomb, 299 F.3d at 315; see also United States v. Sotomayor-Vasquez, 249 F.3d 1, 8 (1st Cir. 2001) (reasoning that "an expansive definition of [the term ']agent['] is necessary to fulfill the purpose of § 666").

However, in this case the government does not allege that the defendants "used any official authority conferred [upon them] by their [l]egislative [b]ranch positions to commit a violation of § 666(a)(1)(A), or even that either had the ability to use any such authority." Defs.' Dismissal Reply at 7. Instead, the government merely alleges that Sunia was counsel to the Fono from February of 1999 to July of 2001, Indictment ¶ 11, and that Lam Yuen, having been a member of the Fono since January of 2001, has "served on the Government Operations, Legal Affairs, Economic & Development, and Public Works committees," id. ¶ 15. Although the government apparently finds these bare allegations of membership in the legislative branch sufficient for purposes of § 666(a)(1)(A), see Gov't's Dismissal Opp'n at 3 (asserting that the Fono "oversees spending and regulations on the islands"), the reality is that they are a far cry from the situation in Lipscomb, where the defendant "used . . . his vote, his oversight authority, his agenda-setting power, and his other parliamentary privileges" to influence legislation in exchange for bribes. Lipscomb, 299 F.3d at 307.

Similarly, at the August 4, 2009 hearing before this Court, the government suggested that an allegation in the indictment that the defendants conspired "to personally enrich themselves, their relatives, and their business associates by using their positions in the [American Samoa government] and relationships with the Director of Education and Chief Procurement Officer to secure for companies under their control lucrative payments totaling hundreds of thousands of dollars," Indictment ¶ 27, somehow qualifies as an allegation that the defendants misused their official authority as agents of the legislative branch to convert funds from the executive branch. But alleging that the defendants planned to "us[e] their positions" in the legislative branch to their advantage in some unspecified way is not the same as alleging that they actually used the authority conferred upon them by law to convert funds from the American Samoa Department of Treasury. Exploiting the personal cachet appurtenant to one's role in the legislature for personal gain, for example, does not necessarily implicate the same concerns raised by the use of a legislator's official authority because it may not undermine the integrity of any decision made at the governmental level or result in the conversion of funds from the government itself (as opposed to one of its agencies) in the same way that the exercise of a legislator's official authority would.

The Court therefore finds that <u>Phillips</u> is both persuasive and applicable to the case at hand. While Lam Yuen, at least, might have been subject to the reach of § 666 had he in some way used his role as a member of the Fono to procure the funds allegedly converted from the executive branch based upon <u>Lipscomb</u>, those facts are not alleged here. Consequently, the defendants cannot be considered "agents" within the meaning of § 666 for the duration of their employment in the legislative branch under the reasoning of <u>Phillips</u>.

The government suggests that any reliance by this Court on <u>Phillips</u> would be "misplaced" because the Fifth Circuit's analysis in that case occurred after Phillips had been convicted and with the benefit of a record for review.  Gov't's Dismissal Opp'n at 9.  But as the defendants correctly point out, "there is no basis for deferring resolution of the 'agent' issue . . . given the government's failure to dispute that, as a matter of American Samoa law, neither the Legal Counsel to the Fono nor a Member of the Senate may act on behalf of or control any of the [e]xecutive [b]ranch [d]epartments at issue."  Defs.' Dismissal Reply at 8. "An indictment must set forth each element of the crime that it charges," <u>Almendarez-Torres v. United States</u>, 523 U.S. 224, 228 (1998), and a motion to dismiss the indictment is the appropriate mechanism for determining whether this requirement has been met, <u>see</u> <u>United States v. Panarella</u>, 277 F.3d 678, 685 (3d Cir. 2002) (holding that a motion to dismiss the indictment is appropriate where "a charging document fails to state an offense if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute[] as a matter of statutory interpretation").  As the indictment fails to state that Lam Yuen was ever an agent of the executive branch and states that Sunia was an agent of that branch only for a specified period of time, Count Two of the indictment must be dismissed in its entirety with respect to Lam Yuen and dismissed with respect to Sunia insofar as it concerns his conduct as an agent of the legislative branch.

Finally, the government's alternative position that the defendants can be charged for aiding and abetting violations of § 666(a)(1)(A) under 18 U.S.C. § 2 is misguided.  <u>See</u> Gov't's Dismissal Opp'n at 10–11 ("[E]ven if [the] defendants weren't in agent positions during the entirety of the scheme, the jury could nonetheless find them guilty under an 18 U.S.C. § 2 theory.").  For the reasons stated above, Lam Yuen was never an "agent" of the executive branch

for purposes of § 666(a)(1)(A); consequently, Sunia could never have aided and abetted his violation of that statute. See In re Nofziger, 956 F.2d 287, 291 (D.C. Cir. 1992) ("It is well established that there must be a guilty principal before a second party can be found to be an aider or abettor."). And as the defendants correctly note, the government alleges only that Lam Yuen and Sunia were part of a conspiracy to obtain property by fraud from the American Samoa government in violation of § 666(a)(1)(A), Defs.' Dismissal Reply at 8; see also Indictment ¶ 26 (alleging only that the defendants "knowingly conspire[d], confederate[d,] and agree[d] . . . to commit offenses against the United States, including" fraud concerning programs receiving federal funds)—it never alleges that Lam Yuen aided and abetted Sunia's direct commission of that offense. Accordingly, the government's fallback argument in support of an aiding and abetting charge fares no better than its arguments in favor of charges for direct violations of § 666(a)(1)(A), and must be rejected.

The government's proposed interpretation of § 666(a)(1)(A) would both extend the scope of the statute far beyond its purpose as explained by Supreme Court in Salinas and Sabri and contravene the canons of statutory construction that guide this Court's reading of the statute's plain language. The Court therefore declines to adopt it. Instead, it concludes that § 666(a)(1)(A) requires that a defendant be an agent of the state or local government agency receiving federal funds where those funds are allocated to a specific agency rather than the government in general. As there is no dispute that the federal funds at issue in this case were received by the American Samoa Department of Treasury and allocated to the American Samoa Department of Education, the defendants can be held liable for the conversion of funds from that agency under § 666 only to the extent that they acted as agents of those branches of the

government at the time of the funds' conversion.  Count Two will be dismissed in its entirety with respect to Lam Yuen and in part with respect to Sunia.

B.     Statute of Limitations

The defendants also seek to dismiss portions of Counts Two through Four of the indictment based upon the statute of limitations set forth in 18 U.S.C. § 3282.  Subsection (a) of this statute provides that "[e]xcept as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed." According to the defendants, "[t]he five-year limitations period imposed by § 3282(a) requires that Counts Two and Three be [partially] dismissed because they are based, in part, on conduct that allegedly occurred more than five years before the [i]ndictment was returned on September 6, 2007," Defs.' Dismissal Mem. at 13–14, and Count Four should be dismissed in part as well because "[t]wo of the three violations of § 666(a)(2) alleged [therein] purportedly occurred more than five years before [the return of] the [i]ndictment," id. at 20.

The government attempts to refute this argument in two ways.  First, it argues that the facts alleged in the indictment "charge a continuing course of criminal conduct," for which "it is sufficient that any criminal act occur within the statute of limitations period," with respect to Count Two, Gov't's Dismissal Opp'n at 11, as well as the bribery charges in Counts Three and Four, id. at 18–19.  Second, it argues that fraud in violation of § 666(a)(1)(A) "is a continuing offense," and that as a consequence "the statute of limitations [for Count Two] is tolled until the final criminal act [is committed]."  Id. at 11.  The defendants dispute both of these assertions. See Defs.' Dismissal Reply at 10–15 ("It would be inappropriate to apply the 'continuing course of conduct' standard to determine whether a prosecution is untimely.'"); id. at 15–19 (attempting

to distinguish the cases cited by the government in support of its position that § 666(a)(1)(A) is a "continuing offense").

     1.    <u>Applicability of "continuing course of criminal conduct" doctrine</u>

     The government's primary argument is that its fraud and bribery charges under § 666 are insulated from dismissal on statute of limitations grounds by the "continuing course of criminal conduct" doctrine. Gov't's Dismissal Opp'n at 12–17. This argument is firmly at odds with the Seventh Circuit's ruling in <u>United States v. Yashar</u>, 166 F.3d 873 (7th Cir. 1999), where the defendant, who "was on the payroll of the Chicago City Council's Committee on Finance from June 1, 1989[,] until September 1, 1992," was charged under § 666 for allegedly "receiv[ing] $9,223 in wage payments and health insurance coverage[] for which he did little or no work." <u>Id.</u> at 875. The grand jury did not return an indictment against the defendant until January 8, 1998, but the government received a limited waiver from the defendant on August 13, 1997, tolling the statute of limitations from that point forward. <u>Id.</u> Nevertheless, the district court dismissed the indictment, concluding that the benefits the defendant received "after August 13, 1992, [did] not meet the statutory minimum of $5,000," and that any fraudulent receipt of benefits received before that time was "barred by the statute of limitation[s]." <u>Id.</u> On appeal to the Seventh Circuit, the government argued, as it does here, that the offense committed by the defendant "[was] a 'continuing course of conduct' that straddle[d] the limitations period." <u>Id.</u> at 876.

     The Seventh Circuit rejected this argument. The court concluded that the approach advocated by the government "would treat a continuing course of conduct or scheme the same as a continuing offense under" the Supreme Court's ruling in <u>Toussie v. United States</u>, 397 U.S. 112 (1970), where the Supreme Court held that limitations periods could be extended "only in

cases in which Congress explicitly defines an offense as continuing, or in which the crime by its nature is such that Congress must have intended it to be considered continuing," Yashar, 166 F.3d at 877. The government's approach would, in the court's view, have effectively "add[ed] to those factors a third one" by disregarding the statute of limitations "whenever the charged conduct [was] continuous in nature," thereby "largely swallow[ing] the second factor of Toussie" and "eviscerat[ing] its narrow, selective approach." Id. (emphasis in original). The Seventh Circuit therefore "reject[ed] this approach as inconsistent with Toussie . . . and as contrary to the purpose of the statute of limitations." Id.

This Court finds no basis to depart from the well-reasoned analysis of Yashar. As the Tenth Circuit noted in United States v. Jaynes, 75 F.3d 1493 (10th. Cir. 1996), "a continuing offense is not the same as a scheme or pattern of illegal conduct," id. at 1506. The purpose of the continuing offense doctrine is to prevent the arbitrary application of the statute of limitations to those few "fundamentally different" offenses where "an unlawful course of conduct . . . perdure[s]" after the fulfillment of each element of the crime in question, such as in a conspiracy or a kidnapping prosecution. United States v. McGoff, 831 F.2d 1071, 1078 (D.C. Cir. 1987). In contrast, the presence of a common scheme uniting discrete acts has traditionally been found to be relevant in determining whether an indictment should be dismissed for duplicity, i.e., "the joining in a single count of two or more distinct and separate offenses." United States v. Klat, 156 F.3d 1258, 1266 (D.C. Cir. 1998); see also United States v. Bruce, 89 F.3d 886, 889–90 (D.C. Cir. 1996) (holding that an act that could be viewed as an independent execution of a common scheme need not be charged in a separate count to avoid duplicity).

The different contexts in which these doctrines have arisen explain the differences in the scope of their application. The continuing offense doctrine can be "applied in only limited

circumstances" due to the inherent "tension" between the doctrine and the "purpose of a statute

of limitations," which is to "protect individuals from having to defend themselves against

charges when the basic facts may have become obscured by the passage of time" and "minimize

the danger of official punishment because of acts in the far-distant past." Toussie, 397 U.S. at

114–15 (internal citation and quotation marks omitted). But separate acts united by a common

scheme or pattern may be charged together without any concern of impermissible duplicity so

long as this practice does not implicate "the purposes of the prohibition against duplicity," which

include "(1) the prevention of double jeopardy, (2) an assurance of adequate notice to the

defendant, (3) the provision of a basis for appropriate sentencing, and (4) the danger that a

conviction was produced by a verdict that may not have been unanimous as to any one of the

crimes charged." Bruce, 89 F.3d at 890 (internal citation and quotation marks omitted).  To use

a doctrine whose outer boundaries are defined only by the need to provide sufficient notice to the

defendant and clarity to the jury of the nature of the offense charged as a basis for tolling the

statute of limitations would effectively replace the careful balancing performed in Toussie with a

notice standard that in no way honors "the principle that criminal limitations statutes are to be

liberally interpreted in favor of repose," let alone Congress's declaration "that the statute of

limitations should not be extended except as otherwise expressly provided by law." Toussie, 397

U.S. at 115 (internal citation and quotation marks omitted).

There are also practical concerns inherent in transplanting the common scheme or pattern

exception of the duplicity rule into the statute of limitations context.  As the Seventh Circuit

observed in Yashar, "under the government's position, a prosecutorial decision regarding the

scope of the charge would determine the running of the limitations period.  In that manner, the

statute of limitations, designed as a control on governmental action, would instead be defined by

it." Yashar, 166 F.3d at 878.   And while the government avers that "a conscientious application of the rule against duplicity" will alleviate these concerns, Gov't's Dismissal Opp'n at 15, the reality is that the government's approach would essentially subsume the continuing offense doctrine within a much broader notice standard. "With this approach, the limitations period would be virtually unbounded." Yashar, 166 F.3d at 879.

Despite these concerns, the government suggests that no less than three circuit courts of appeals have tolled the statute of limitations based upon the continuing course of criminal conduct doctrine. Gov't's Dismissal Opp'n at 14.   Specifically, it points to United States v. Jensen, 608 F.2d 1349 (10th Cir. 1979), where the Tenth Circuit upheld the defendant's conviction for the fraudulent sale of securities notwithstanding the fact that some (but not all) of the allegedly fraudulent transactions at issue occurred outside the statute of limitations period, id. at 1355–56, United States v. DiSalvo, 34 F.3d 1204 (3d Cir. 1994), where the Third Circuit held that the defendants' extortion convictions were proper even though some (but not all) of the defendants' allegedly extortionate conduct occurred outside the five-year time frame set forth in § 3282, id. at 1217–18, and United States v. Bustamante, 45 F.3d 933 (5th Cir. 1995), where the Fifth Circuit upheld the defendant's bribery conviction despite the fact that the defendant received his first of an on-going series of gratuities outside the statutory time frame, id. at 942, as authority for the proposition that a charged offense "is timely so long as some part of the criminal conduct occurred within the statute of limitations period," Gov't's Dismissal Opp'n at 14.

The Court agrees with the government that it cannot dismiss any of the counts in the indictment in their entirety so long as some part of the criminal conduct alleged occurred within the timeframe of the applicable statute of limitations. But the defendants do not seek to dismiss

Counts Two through Four of the indictment in their entirety. Rather, they seek to dismiss those portions of the charged offenses that could be construed as seeking a criminal conviction based upon actions allegedly taken by the defendants more than five years prior to the return of the indictment. See Defs.' Dismissal Mem. at 26–27 (requesting that the Court "dismiss Counts Two through Four as time-barred to the extent they are based on conduct that allegedly occurred before September 6, 2002"); Defs.' Dismissal Reply at 23 (same). Jensen, DiSalvo, and Bustamante have nothing to say on that score. See Jensen, 608 F.2d at 1355–56 (considering whether evidence of transactions that occurred more than five years prior to the return of the indictment should be admitted into evidence); DiSalvo, 34 F.3d at 1217–18 (considering whether "the indictment was handed down beyond the statute of limitations"); Bustamante, 45 F.3d at 942 (considering whether conviction for bribery should be overturned where initial receipt of unlawful gratuity in the form of loan guarantee took place more than five years before the return of the indictment, but guarantee continued into the five-year period preceding the indictment's return).[4]

The Court therefore rejects the government's contention that offenses committed outside the five-year statute of limitations should be deemed to have occurred within the permitted time period so long as they are part of a larger pattern or scheme that straddles the statutory deadline. A rule designed to provide adequate notice of the nature of a specific charge does not necessarily "protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time" or "minimize the danger of official punishment

---

[4] Indeed, the court in Jensen concluded that the evidence at issue could be admitted "because it showed representations that made the later [(timely-indicted)] omissions misleading." Jensen, 608 F.2d at 1356 (emphasis added). This suggests that evidence of prior acts of fraudulent conversion by the defendants might be admissible into evidence against the defendants, but that the alleged prior acts are not indictable offenses (or components of a consolidated charge in an indictment) in their own right.

because of acts in the far-distant past." Toussie, 397 U.S. at 114–15. Rather, it is the continuing

offense doctrine, not the exception to the duplicity rule for common schemes charged in a single

count, which ensures that these principles are preserved in practice.

2.      Section 666(a)(1)(A) as a continuing offense

The Court is also unreceptive to the notion that § 666(a)(1)(A) (the offense charged in

Count Two of the indictment) is a continuing offense within the meaning of Toussie. As the

Court noted above, an offense cannot be considered to be continuing in nature "unless the

explicit language of the substantive criminal statute compels such a conclusion[] or the nature of

the crime involved is such that Congress must assuredly have intended that it be treated as a

continuing one." Toussie, 397 U.S. at 115. In McGoff, the District of Columbia Circuit

explained the latter concept as follows:

> The notion of "continuing offense" has traditionally identified a
> type of offense fundamentally different from most known to the
> common law.   As first-year law students (presumably) learn, a
> criminal offense is typically completed as soon as each element of
> the crime has occurred.   For example a larceny is completed as
> soon as there has been an actual taking of the property of another
> without consent, with the intent permanently to deprive the owner
> of its use.   The offense does not "continue" over time.   The crime
> is complete when the act is complete.   A "continuing offense," in
> contrast, is an unlawful course of conduct that does perdure.

McGoff, 831 F.2d at 1078.

The defendants argue that fraudulent conversion of property in violation of

§ 666(a)(1)(A) is akin to larceny, and as such should not be considered a continuing offense

under McGoff. Defs.' Dismissal Mem. at 16–17.  The government disagrees.  It contends that

§ 666(a)(1)(A) is more like "other forms of fraud" that have been found to be continuing

offenses, such as bankruptcy fraud, bank fraud, or embezzlement.  Gov't's Dismissal Opp'n at

17–18.  Once again, the government cites a smattering of case law from outside this circuit to

support its position. See id. (citing United States v. Smith, 373 F.3d 561 (4th Cir. 2004), United States v. Stein, 233 F.3d 6 (1st Cir. 2000), and United States v. Nash, 115 F.3d 1431 (9th Cir. 1997)).

The comparison drawn between § 666(a)(1)(A) and the bankruptcy fraud statute at issue in Stein and the bank fraud statute at issue in Nash is inexact at best. The government correctly states that in Stein the First Circuit concluded that bankruptcy fraud is a continuing offense; however, that conclusion turned in large part on the fact that Congress explicitly stated as much in 18 U.S.C. § 3284. Stein, 233 F.3d at 18–19 & n.9; see also 18 U.S.C. § 3284 ("The concealment of assets of a debtor in a case under title 11 shall be deemed to be a continuing offense until the debtor shall have been finally discharged or a discharge denied . . . ."). And while the Ninth Circuit held in Nash that bank fraud in violation of 18 U.S.C. § 1344 is a continuing offense, its holding was based entirely on the language of the statute, which, in the Ninth Circuit's view, "punishe[d] the execution of a scheme to defraud or obtain money." Nash, 115 F.3d at 1441; see also 18 U.S.C. § 1344 (criminalizing the execution or attempt to execute "a scheme or artifice . . . (1) to defraud a financial institution[] or (2) to obtain any . . . property owned by[] or under the custody or control of[] a financial institution[] by means of false or fraudulent pretenses, representations, or promises"). Language of this nature is nowhere to be found in § 666(a)(1)(A).

That leaves Smith, where the Fourth Circuit concluded that embezzlement in violation of 18 U.S.C. § 641 is a continuing offense. Smith, 373 F.3d at 567–68. Unlike the offenses at issue in Stein and Nash, there is a strong textual similarity between the offense at issue in Smith (§ 641) and the statute at issue here (§ 666(a)(1)(A)). Section 641 provides in pertinent part that "[w]hoever embezzles, steals, purloins, or knowingly converts . . . any . . . thing of value of the

United States or of any department or agency thereof . . . [s]hall be fined under this title or imprisoned not more than ten years, or both." Section 666(a)(1)(A) similarly provides that any agent "of a State, local, or Indian tribal government, or any agency thereof" who "embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts . . . property that . . . is valued at $5,000 or more[] and . . . is owned by . . . such organization, government, or agency . . . shall be fined under this title, imprisoned not more than 10 years, or both." The Court therefore agrees with the government that the embezzlement statute at issue in Smith is analogous to § 666(a)(1)(A), and that if one of the two statutes is a continuing offense, the other should be considered one as well.

Nevertheless, this equivalency between § 641 and § 666(a)(1)(A) does not inure to the government's benefit, for this Court cannot adopt the Fourth Circuit's description of embezzlement as a continuing offense. The Fourth Circuit found that embezzlement is a continuing offense because, in its words, "[e]mbezzlement is the type of crime that, to avoid detection, often occurs over some time and in relatively small, but recurring amounts," and because, "[a]t least in those cases where the defendant [has] created a recurring, automatic scheme of embezzlement . . . and maintained that scheme without need for affirmative acts linked to any particular receipt of funds[,] . . . Congress must have intended that such be considered a continuing offense for purposes of the statute of limitations." Smith, 373 F.3d at 567–68. The court clarified, however, that only "the particular kind of embezzlement that occurred in [Smith] is correctly considered, under Toussie, to be a continuing offense," and that "it may well be that different embezzlement conduct must be differently characterized in this regard." Id. at 568.

It is impossible to reconcile this analysis with the actual language of Toussie. There, the Supreme Court held that, absent explicit language in the statute indicating Congress's intent that a crime be considered a continuing offense, a crime can only be considered to be continuing if "the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." Toussie, 397 U.S. at 115 (emphasis added). In other words, the salient inquiry is not whether an offense can be concealed for an extended period of time or repeated ad infinitum under a particular set of circumstances, but whether there is something "inherent in the nature of [the offense] that makes it a continuing [one]." Id. at 122; see also United States v. Niven, 952 F.2d 289, 293 (9th Cir. 1991) ("[T]he analysis turns on the nature of the substantive offense, not on the specific characteristics of the conduct in the case at issue."); overruled in part on other grounds by United States v. Scarano, 76 F.3d 1471, 1474–77 (9th Cir. 1996).

Yet, in Smith the Fourth Circuit focused exclusively "on the specific characteristics of the conduct in the case at issue," Niven, 952 F.2d at 293, even going so far as to acknowledge that embezzlement should be considered a continuing offense only under certain circumstances (but might not under others), Smith, 373 F.3d at 568. The mere fact that the Fourth Circuit could conceive of "different embezzlement conduct" that "must be differently characterized in this regard," id., dispels any notion that "Congress must assuredly have intended that [the offense] be treated as a continuing one," Toussie, 397 U.S. at 115 (emphasis added). Simply put, Smith is not consistent with the precepts of Toussie.

"The federal courts spread across the country owe respect to each other's efforts and should strive to avoid conflicts, but each has an obligation to engage independently in reasoned analysis." In re Korean Air Lines Disaster of Sept. 1, 1983, 829 F.2d 1171, 1176 (D.C. Cir.

1987). This Court is only "obligated to follow controlling circuit precedent" and the precedent of the Supreme Court in reaching its decision. United States v. Torres, 115 F.3d 1033, 1036 (D.C. Cir. 1997). The government points to no authority in this circuit that supports the conclusion reached by the Fourth Circuit in Smith, and the Court does not find the reasoning set forth in that case persuasive in its own right. The Court therefore declines to follow it.[5]

Instead, the Court agrees with the defendants that the fraudulent conversion of funds in violation of § 666(a)(1)(A), like the embezzlement of government property in violation of § 641, is closely analogous to larceny, which the District of Columbia Circuit has classified as an example of a non-continuing offense. See McGoff, 831 F.2d at 1078 ("For example, a larceny is completed as soon as there has been an actual taking of the property of another without consent, with intent permanently to deprive the owner of its use. The offense does not 'continue' over time. The crime is complete when the act is complete."). Such a comparison is especially apt in light of the legislative history of § 666, which indicates that the statute is intended to "cover[] both theft and bribery type offenses" by creating a "statute of general applicability in this area" that criminalizes "thefts from other organizations or governments receiving [f]ederal financial assistance" even if "the property stolen" is not property of the United States. S. Rep. No. 98-225, at 369 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3510. Moreover, the unlawful conversion of property, whether it be through fraud or some other means, is, like larceny, "completed as soon as there has been an actual taking of the property," McGoff, 831 F.2d at

---

[5] Even if the Court were inclined to follow Smith, the qualifications placed by the Fourth Circuit on its conclusion that embezzlement is a continuing offense render the decision inapposite. As the defendants correctly note, "the [i]ndictment in this case does not allege that the timing or amounts of the purportedly fraudulent orders [at issue in this case] followed any identifiable pattern, let alone one that was regular and automatic." Defs.' Dismissal Reply at 17. Yet, it was the "recurring, automatic" nature of the "scheme of embezzlement" at issue in Smith that led the Fourth Circuit to conclude that "the particular kind of embezzlement that occurred in [that] case is correctly considered, under Toussie, to be a continuing offense." Smith, 373 F.3d at 567–68. The Fourth Circuit's ruling is therefore not applicable to the conduct alleged to have occurred in this case.

1078, unlike the paradigmatic continuing offense of conspiracy, where "each day's acts bring a renewed threat of the substantive evil Congress sought to prevent" in criminalizing the conduct, Toussie, 397 U.S. at 122.

The Court therefore concludes that the fraudulent conversion of property in violation of § 666(a)(1)(A) is not a continuing offense under Toussie. Therefore, the defendants cannot be held criminally liable for any violations of that statute that predate the five-year period preceding the return of the indictment in this case. Accordingly, Count Two of the indictment must be dismissed to the extent that it encompasses conduct allegedly committed beyond that five-year statute of limitations period.

C.      Sufficiency of Allegations in Obstruction Charges

In their motion to dismiss, the defendants argued that Counts Five and Six of the indictment, which charge the defendants with obstruction of an agency proceeding under 18 U.S.C. § 1505, were "insufficient as a matter of law" because the government never alleges that the defendants "knew of or believed" that an investigation of the American Samoa Department of Education "was pending when they made their alleged[ly obstructive] statements." Defs.' Dismissal Mem. at 26. According to the defendants, § 1505 requires that the defendants must have known not only that they were obstructing a federal investigation when they did so, but that they were obstructing an investigation by the specific agency that is the subject of the investigation. Id. at 25–26. In this case, that would be the United States Department of Education. Id. at 26. Because the government does not allege that the defendants knew that they were obstructing an investigation into the Department of Education when they engaged in their allegedly obstructive conduct, the charges for obstruction must, in the defendants' view, be dismissed. Id.

36

At the hearing held on the merits of the defendants' motion on September 8, 2008, the

Court rejected this argument and denied the defendants' request to dismiss Counts Five and Six

of the indictment. Hr'g Tr. 40:9–12, Sept. 8, 2008.  The Court explained its decision as follows:

> As to [Counts Five and Six], first of all, it is my view that looking
> at the indictment as a whole, and considering the language that's
> used in these particular two counts, it seems to me that it's clear,
> especially in light of case law that clearly requires or indicates
> what the elements are that make out a [§] 1505 offense, . . . what
> the government would have to prove.
>
> And considering what they've alleged, although they don't use the
> magic language that the defense says they should have used, I
> think it's sufficient to allege the elements of the offense of a
> [§] 1505 violation and clearly, it seems to me, [the indictment] is
> adequate to place the defendants on notice as to what they're being
> charged with.  I don't think there's any potential that somehow
> [the defendants are] surprised as to what the nature of the
> government's allegations are, and[] therefore[] would not be in an
> intelligent position to defend against these allegations.
>
> And I think there is no potential that this indictment is [so] vague
> that[,] as a result of that, there's a likelihood that they could be re-
> prosecuted for this same conduct.
>
> And obviously those are the two objectives of the indictment, to
> guard against re-prosecution for the same violation and to not
> cause a defendant to have to go to trial without having an ability to
> defend against the allegations [against them] because they don't
> know what the nature of those allegations are, and I think both of
> those objectives of an indictment are satisfied with the indictment
> here.
>
> . . .
>
> So it is my view that in reference to these two counts, despite the
> arguments made by the defense, . . . they are adequately pled and[]
> therefore[] [I] [will] deny the motion to dismiss these two counts.

Id. at 38:5–39:5, 40:9–12.

The defendants argue in their motion for reconsideration that the Court erred in reaching

this result.  Specifically, they argue that the defendants' "failure to allege an essential element of

[C]ounts [F]ive and [S]ix is a core violation of [the defendants'] rights under the Grand Jury

Clause of the Fifth Amendment," Defs.' Reconsideration Mot. at 1–2, and that "[a]ccordingly,

[C]ounts [F]ive and [S]ix should be dismissed," id. at 2.  The government contends that this

argument "[was] considered and rejected by this Court in its prior ruling[,] and reconsideration is

inappropriate absent some showing of clear error," Gov't's Reconsideration Opp'n at 3, which it

asserts does not exist, id. at 4–6.[6]

The Court agrees with the defendants that its reasoning in rejecting their arguments for

dismissal of Counts Five and Six is flawed because the Court failed to recognize the defendants'

Fifth Amendment interests in having the charges against them presented by a grand jury.  "In

federal prosecutions, 'no person shall be held to answer for a capital[] or otherwise infamous

crime, unless on a presentment or indictment of a Grand Jury' alleging all the elements of the

crime."  Harris v. United States, 536 U.S. 545, 549 (2002) (quoting U.S. Const. amend. V).  "The

right to have the grand jury make the charge on its own judgment is a substantial right which

cannot be taken away," Stirone v. United States, 361 U.S. 212, 218–19 (1960), the "very

purpose" of which "is to limit [the accused's] jeopardy to offenses charged by a group of his

fellow citizens acting independently of either prosecuting attorney or judge," id. at 218.  Thus,

---

[6] The parties also devote considerable effort to debating whether the proposed jury instructions filed by the parties justify reconsideration of this issue.  See Defs.' Reconsideration Mot. at 1 ("The proposed [jury] instructions state that [the defendants] cannot be convicted of violating § 1505 unless they knew that the specified proceeding was pending before the United States Department of Education. . . . Thus, it is now undisputed that knowledge of the allegedly obstructed proceeding is an essential element of [C]ounts [F]ive and [S]ix." (internal citation and quotation marks omitted)); Gov't's Reconsideration Opp'n at 6–7 ("Nothing about the jury instructions can fairly be characterized as new evidence nor does it represent a change in the governing law since the Court's ruling ten months ago."); Defs.' Reconsideration Reply at 1 n.1 (arguing that, whereas the Court had "at least question[ed]" the notion that the government had to allege the defendants' knowledge of the agency proceeding in question at the September 8, 2008 hearing on the merits of the defendants' motion to dismiss, "[u]nder the subsequently proposed joint jury instructions . . . , it is clear that knowledge of agency proceedings must be expressly alleged in the indictment to state an offense under 18 U.S.C. § 1505").  However, in their reply memorandum in support of their motion for reconsideration, the defendants clarify that the basis for their motion is the Court's purportedly manifest error in refusing to dismiss Counts Five and Six of the indictment.  Defs.' Reconsideration Reply at 2.  The parties' dispute over the effects of the parties' proposed jury instructions is therefore of no moment.

"[t]o allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant" of the "protection which the guaranty of the intervention of a grand jury was designed to secure[,] [f]or a defendant could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him."  Russell v. United States, 369 U.S. 749, 770 (1962).

As the case law surveyed above makes plain, the Court erred in articulating only two concerns—adequate notice to the defendants and sufficient specificity to prevent re-prosecution for the same offense—that must be satisfied for a charge to survive a motion to dismiss.  Rather, as nearly every circuit court of appeals has expressly held, "[a] valid indictment must: (1) <u>allege the essential facts constituting the offense</u>[,] (2) allege each element of the offense, so that fair notice is provided[,] <u>and</u> (3) be sufficiently distinctive that a verdict will bar a second prosecution for the same offense."  United States v. Bolden, 325 F.3d 471, 490 (4th Cir. 2003) (emphasis added); <u>accord</u> United States v. Sandoval, 347 F.3d 627, 633 (7th Cir. 2003); <u>United States v. Hathaway</u>, 318 F.3d 1001, 1009 (10th Cir. 2003); <u>United States v. Hernandez</u>, 299 F.3d 984, 992 (8th Cir. 2002); <u>United States v. Caldwell</u>, 302 F.3d 399, 410 (5th Cir. 2002); <u>United States v. Woodruff</u>, 296 F.3d 1041, 1046 (11th Cir. 2002); <u>United States v. Cor-Bon Custom Bullet Co.</u>, 287 F.3d 576, 579 (6th Cir. 2002); <u>United States v. Eirby</u>, 262 F.3d 31, 37 (1st Cir. 2001).  The second and third requirements of an indictment, which derive from the notice requirement of the Sixth Amendment and the Double Jeopardy clause of the Fifth Amendment, respectively, <u>United States v. Higgs</u>, 353 F.3d 281, 296 (4th Cir. 2003), are adequately addressed in the Court's September 8, 2008 decision; the first requirement, which has its origins in the Grand Jury Clause, <u>see</u> discussion <u>supra</u>, is not.

Accordingly, the Court agrees with the defendants that it must partially reconsider its prior ruling on this issue to determine whether Counts Five and Six of the indictment satisfy the Grand Jury Clause. Further, the question before the Court in considering the sufficiency of the government's allegations for purposes of this analysis is not whether the allegations place the defendants on notice of the nature of the crimes for which they have been charged or are specific enough to foreclose re-prosecution for the same offense, but whether "the indictment . . . omits language essential to the definition of the offense which it purports to charge." United States v. Pickett, 353 F.3d 62, 67 (D.C. Cir. 2004); see also United States v. Hooker, 841 F.2d 1225, 1230 (4th Cir. 1988) ("[N]otice is only half the question. . . . [A] sufficient indictment must contain the elements of the offense and apprise the defendant of the nature of the charge." (emphasis in original)). If such language is missing, the Court must dismiss Counts Five and Six. See Pickett, 353 F.3d at 68 (holding that where "[t]he indictment against [the defendant] [did] not charge all the elements of the offense[,] [h]is motion to dismiss was well taken"); Hooker, 841 F.2d at 1232 (holding that the "complete absence" of an essential element "is a fatal defect").

The government acknowledges that "knowledge is an element of the offense" for obstruction charges under § 1505, Gov't's Reconsideration Opp'n at 7, and the Court held as much at the hearing on the merits of the defendants' motion, see Hr'g Tr. 13:22–24, Sept. 8, 2008 (reflecting the Court's observation that § 1505 "clearly" requires that the government "prove that [the defendants] knew that there was an investigation being conducted by the Department of Education"). Further, the government does not dispute that it failed to explicitly allege that the defendants knew of the agency proceeding that they allegedly obstructed when they were interviewed by federal officials. See Gov't's Reconsideration Opp'n at 5 (admitting that the indictment does not contain "the 'magic words' that the [d]efendants claim should have

been used"). Instead, the government's position is that "knowledge of the pending proceeding is easily and naturally inferred from the plain language of the [i]ndictment." Id.

The government's position is understandable as a general legal proposition. "In reviewing the sufficiency of an indictment, a court should consider each challenged count as a whole and should refrain from reading it in a hypertechnical manner." United States v. Palumbo Bros., Inc., 145 F.3d 850, 860 (7th Cir. 1998) (internal citation and quotation marks omitted). "Similarly, if the facts alleged in the indictment warrant an inference that the jury found probable cause to support all the necessary elements of the charge, the indictment is not fatally deficient on Fifth Amendment grounds." United States v. Fern, 155 F.3d 1318, 1325 (11th Cir. 1998); accord United States v. LaSpina, 299 F.3d 165, 177 (2d Cir. 2002); Palumbo Bros., 145 F.3d at 860. Thus, Counts Five and Six of the indictment may pass constitutional muster so long as the defendants' knowledge of an investigation by the Department of Education, while perhaps not explicitly alleged in the indictment, is "necessarily implied by the specific allegations made." United States v. Silverman, 430 F.2d 106, 111 (2d Cir. 1970).

But while the law in general may be on the government's side, the facts of this case are not. The government suggests that paragraphs 57 and 58 of the indictment, when read together, give rise to a necessary inference that Sunia knew he was obstructing a Department of Education proceeding when he allegedly obstructed that proceeding, and that paragraphs 62 and 63 of the indictment do the same with regards to Lam Yuen. Paragraphs 57 and 58 of the indictment state:

> On or about April 27, 2005, as part of the above-described joint investigation into fraud, waste, and abuse in American Samoa, SUNIA submitted to a voluntary interview with federal law enforcement agents from the [United States] Department of Homeland Security's Office of Inspector General and the Federal Bureau of Investigation. The interview took place at the Executive Office Building in Pago Pago, American Samoa.

> On or about April 27, 2005[,] in the territory of American Samoa, AITOFELE T.F. SUNIA[,] defendant herein[,] did corruptly endeavor to influence, obstruct[,] and impede the due and proper administration of the law under which a proceeding, to wit[,] an investigation of allegations of fraud, waste[,] and abuse within an entity receiving funds from the United States, was pending before the [United States] Department of Education[] by making materially false and misleading statements to federal agents engaged in such proceeding . . . .

Indictment ¶¶ 57–58; see also id. ¶¶ 62–63 (substituting the name of Lam Yuen, the alleged date of his interrogation, and the fact that he was interviewed by a Department of Interior employee rather than a Department of Homeland Security employee, but otherwise repeating these same allegations).

Having carefully reviewed these paragraphs several times, the Court does not see how it is "necessarily implied" in these allegations, Silverman, 430 F.2d at 111, that the defendants ever knew they were obstructing a United States Department of Education proceeding. The government alleges neither that the defendants were ever told that such a proceeding was in existence, nor that they were interviewed by Department of Education officials. It simply alleges that the defendants were interviewed by "federal law enforcement agents from the [United States] Department of Homeland Security's Officer of Inspector General and the Federal Bureau of Investigation," Indictment ¶ 57; see also id. ¶ 62 (making the same allegations with respect to agents from the United States Department of Interior's Office of Inspector General and the Federal Bureau of Investigation), and that they "ma[de] materially false and misleading statements to [those] federal agents," id. ¶ 58; see also id. ¶ 63 (same). These allegations would certainly give rise to an inference that the defendants knew they were obstructing an investigation of some sort, but nothing in the allegations would lead one to believe that the

defendants knowingly obstructed an agency proceeding initiated by the Department of Education in particular.

At the hearing on the merits of the defendants' motion for reconsideration held on August 4, 2009, the government argued that statements allegedly made by the defendants at their interviews suggests knowledge of the pending agency investigation because those statements concern business transactions relating to the American Samoa Department of Education. But this establishes at most that the defendants might have known the subject matter of the investigation for which they were interviewed, not the existence of the agency proceeding (or identity of the agency sponsoring the proceeding) giving rise to the investigation. Certainly, the Department of Justice would be just as interested in the defendants' allegedly fraudulent transactions with the American Samoa Department of Education as the United States Department of Education, as the defendants' current predicament demonstrates. Ultimately, there are no allegations in the indictment from which one could infer that the defendants ever knew of the origin of the investigation for which they were interviewed, and thus no allegations giving rise to an inference that the defendants knew they were obstructing a United States Department of Education proceeding as required to allege an offense under § 1505.

The government also argued at the hearing held on August 4 that one could infer knowledge of a Department of Education proceeding by the defendants based upon the allegations that they were interviewed by a United States Department of Homeland Security representative because that representative was in fact a former Department of Education employee assigned to the agency's investigation of fraudulent business practices in the American Samoa Department of Education and was actually completing her work on that investigation when she interviewed the defendants. These facts, however, are not alleged in the indictment;

consequently, the Court cannot say with any degree of certainty that "a group of

[the defendants'] fellow citizens" found these allegations to be probably true, Stirone, 361 U.S.

at 218, but instead would have to "guess as to what was in the minds of the grand jury at the time

they returned the indictment," Russell, 369 U.S. at 770.  Such an exercise is not permitted by the

Fifth Amendment.

Finally, the government argued in the alternative at the August 4 hearing that simply

tracking the statutory language of § 1505, as the government does in paragraphs 58 and 63 of the

indictment, suffices to establish knowledge on the part of the defendants because the statute

requires that the defendants "corruptly endeavor[ed]" to obstruct an agency proceeding and the

defendants could not have done so without first knowing of the agency proceeding in question.

As with the government's principal argument that an element of an offense can be inferred from

the surrounding factual allegations, there is precedent to support this argument.  For example, in

United States v. Donahue, 948 F.2d 438 (8th Cir. 1991), the Eighth Circuit concluded that an

indictment charging a defendant with armed bank robbery and the use of a firearm during a

robbery was not "fatally defective" notwithstanding the absence of an allegation that the

defendant engaged in these acts with "criminal intent," an essential element of the crime, because

the court found it "inconceivable that anyone lacking criminal intent could commit armed bank

robbery" given the act's "inherent[] and essential[] evil," id. at 440–41 (internal citation and

quotation marks omitted).

Unfortunately for the government, the language of § 1505, as followed in the indictment,

is no so felicitous.  Tracking § 1505, the indictment actually states that the defendants "corruptly

endeavor[ed] to influence, obstruct[,] and impede the due and proper administration of the law

under which a proceeding . . . was pending," Indictment ¶ 58 (emphasis added); see also id. ¶ 63

(same), not that the defendants corruptly endeavored to obstruct a specific agency proceeding arising under "the law" in question.  These are discrete elements.  As the Second Circuit recognized in United States v. Quattrone, 441 F.3d 153 (2d Cir. 2006):

> To prove obstruction of an agency proceeding, the government must establish that (1) there was a proceeding before a department or agency of the United States[,] (2) the defendant knew of or believed that the proceeding was pending[,] and (3) the defendant corruptly endeavored to influence, obstruct, or impede the due and proper administration of the law under which the proceeding was pending.

Id. at 174 (internal citation and quotation marks omitted) (emphasis added); accord United States v. Bhagat, 436 F.3d 1140, 1147 (9th Cir. 2006).

"Ordinarily, it is proper for an indictment to be drawn in the language of the statute, . . . but following the generic wording of a statute is not necessarily sufficient." United States v. Nance, 533 F.2d 699, 701 (D.C. Cir. 1976) (per curiam).  Section 1505 exemplifies this rule.  To adequately charge a defendant with obstruction of an agency proceeding, the government must do more than simply recite the language of the statute without comment.  It must also allege facts supporting the threshold requirement that the defendant knew about the agency proceeding arising under "the law" that he "corruptly endeavor[ed]" to obstruct.  Nothing in the indictment establishes this element of the offense, whether by inference or otherwise. Therefore, the Court must dismiss Counts Five and Six of the indictment as defectively charged under § 1505.

"The oral ruling of a trial judge is not immutable, and is of course subject to further reflection, reconsideration[,] and change." United States v. Green, 414 F.2d 1174, 1175 (D.C. Cir. 1969) (per curiam).  Here, it is apparent that the Court erred in denying earlier the defendants' motion to dismiss Counts Five and Six of the indictment.  Because the government

does not allege in the indictment that the defendants knew of the agency proceeding they

allegedly obstructed, and because knowledge of that proceeding is an essential element of the

offense, the Court will grant the defendants' motion for reconsideration, vacate its prior oral

ruling on this issue, and dismiss Counts Five and Six of the indictment in their entirety.

### III. Conclusion

"[T]he indictment must contain an allegation of every fact which is legally essential to

the punishment to be inflicted." United States v. Reese, 92 U.S. 214, 232 (1875) (Clifford, J.,

dissenting). In this case, the government has failed to satisfy this standard in part by failing to

allege an agency relationship between Lam Yuen and (for a certain period of time) Sunia and the

applicable branch of the American Samoa government for the purposes of 18 U.S.C.

§ 666(a)(1)(A). Moreover, the government has improperly charged the defendants with at least

some conduct that occurred outside the five-year statute of limitations set forth in 18 U.S.C.

§ 3282. Finally, the government has charged the defendants with obstruction of an agency

proceeding in violation of 18 U.S.C. § 1505 without alleging all of the elements necessary for

conviction under that statute. The Court will therefore grant the balance of the defendants'

motion to dismiss as well as their motion for partial reconsideration.

**SO ORDERED** this _10_ day of August, 2009.[7]

REGGIE B. WALTON
United States District Judge

---

[7] An order will be entered contemporaneously with this memorandum opinion (1) granting in part and denying in part the defendants' motion to dismiss, (2) dismissing Count Two of the indictment in its entirety with respect to Lam Yuen, and dismissing Count Two with respect to Sunia to the extent that it charges Sunia with violations of 18 U.S.C. § 666(a)(1)(A) while he was an agent of the legislative branch and to the extent that it charges Sunia with violations of that same statute occurring prior to September 6, 2002, (3) dismissing Counts Three and Four to the extent that these counts charge the defendants with violations of 18 U.S.C. § 666(a)(2) occurring prior to September 6, 2002, (4) granting the defendants' motion for partial reconsideration, (5) vacating the Court's oral ruling issued on September 8, 2008, insofar as that ruling concerns the defendants' argument that Counts Five and Six of the indictment must be dismissed for failure to allege an essential element of the offense, and (6) dismissing Counts Five and Six.